**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-11741

————————————

L.E.,
  by and through their parent and next friend,
  Sara Cavorley,

B.B.,
  a minor, by and through their parent and next friend,
  Elizabeth Baird,

A.Z.,
  a minor, by and through their parent and next friend,
  Jessica Zeigler,

C.S.,
  a minor, by and through their parent and next friend,
  Tarasha Shirley,

                                                    *Plaintiffs-Appellants,*

*versus*

SUPERINTENDENT OF COBB COUNTY SCHOOL DISTRICT,
RANDY SCAMIHORN,
  in his official capacity as a member of the Cobb County
  Board of Education,

DAVID BANKS,

    in his official capacity as member of the Cobb County
    School Board,

DAVID CHASTAIN,

    in his official capacity as member of the Cobb County
    School Board,

BRAD WHEELER,

    in his official capacity as member of the Cobb County
    School Board, et al.,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04076-TCB

————————————

Before JILL PRYOR, NEWSOM, and LAGOA, Circuit Judges.

NEWSOM, Circuit Judge:

This appeal is about a Georgia school district's response to COVID-19. After requiring masks in schools during the pandemic's early phase, the Cobb County School District later pivoted, opting to prohibit schools from adopting mandatory-masking rules. Under the revised policy, students could wear masks if they wanted to, but school officials couldn't make them. Unhappy with the new policy, four Cobb County students sued the School District under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. They sought a preliminary injunction requiring the School District to consider their request that it adopt a county-wide mask mandate. The district court (1) dismissed two

students for lack of standing because they had unenrolled from their Cobb County schools and then (2) concluded that the remaining two were unlikely to prevail on the merits. After careful review and with the benefit of oral argument, we (1) reverse the district court's decision that the two unenrolled students lacked standing but (2) affirm its decision to deny the other two a preliminary injunction.

## I

## A

This case involves four students—A.Z., B.B., C.S., and L.E.—who, at one time or another relevant to our purposes, attended public schools in Cobb County, Georgia. All four have various disabilities that make them particularly vulnerable to respiratory viruses—including, most notably, COVID-19.[1] When the pandemic first reached our shores in March 2020, the Cobb County School District shuttered all in-person learning. It began phasing back in-person operations about six months later, in the fall of 2020. For the first pandemic-era schoolyear, the School District adopted measures consistent with guidelines from the CDC and local health authorities—including masking, social distancing, frequent sanitizing of classrooms, and quarantines. *L.E. v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296, 1299 (11th Cir. 2022).

---

[1] Our account of the facts draws both from the record below and from our previous opinion addressing the students' case. *See L.E. v. Superintendent of Cobb Cnty. Sch. Dist.*, 55 F.4th 1296 (11th Cir. 2022).

As the 2021–2022 schoolyear began, the School District loosened its COVID restrictions. It relaxed, for instance, its quarantine and social-distancing requirements. More to the point here, it reversed its masking policy. Rather than requiring masks, the School District *banned* mask mandates. *L.E.*, 55 F.4th at 1299. The policy change led the four students' parents to pull them out of their respective schools and request that the School District reinstitute the former COVID restrictions. The School District declined to readopt mask mandates (and other requested measures) because they conflicted with its new policy. Their requested accommodations having been denied, the students stayed home and attended classes virtually during the 2021–2022 schoolyear; only A.Z. returned to in-person schooling in February 2022.

Then came the 2022–2023 schoolyear. B.B. and L.E. returned to their Cobb County schools in person. They asked that their schools require students and teachers in their classrooms to wear masks, but the School District again refused because mask mandates defied the new COVID policy.[2] A.Z. and C.S. unenrolled from Cobb County schools and enrolled in private schools instead. All four students allege that the School District's actions have

---

[2] By then, school mask mandates also violated Georgia law. In March 2022, Georgia's legislature passed the "Unmask Georgia Students Act," which prohibits school systems from requiring students and employees to wear face masks without an opt-out. *See* Ga. Code Ann. §§ 20-2-59, 20-2-779.2, 20-2-2077, 20-2-2094.

caused them to "los[e] hundreds of days of in-person learning." Br. of Appellants at 8.

### B

In the fall of 2021, while all four students were still enrolled at Cobb County schools, they sued the School District under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act—both of which guarantee disabled individuals an equal opportunity to access public services, programs, and activities. *See* 42 U.S.C. § 12132 (ADA); 29 U.S.C. § 794(a) (RA). As relevant here, the students alleged that the School District had discriminated against them by refusing to accommodate their disabilities. *L.E.*, 55 F.4th at 1299. Along with their request for damages, the students moved for a preliminary injunction, asking the district court to compel the School District to reverse its prohibition on mask mandates and maintain compliance with all CDC guidelines for accommodating disabled students. *Id.* at 1300–01. The district court denied the preliminary injunction based on its conclusion that the students were unlikely to prevail on their ADA and RA claims. *Id.* at 1299.

We reversed. After ruling that the dispute wasn't moot because the students continued to demand individualized accommodations, we held that the district court had used too wide a lens in analyzing the students' failure-to-accommodate claim. *Id.* at 1301–03. While the district court had concluded that the School District's accommodations provided the students with sufficient access to education in general, the inquiry's proper focus should have

6                    Opinion of the Court                    23-11741

been on the students' access to "*in-person* schooling" in particular. *Id.* at 1303. We remanded for the district court to reassess the students' claim in light of our ruling. *Id.*

On remand, the students filed an amended motion for a preliminary injunction. They alleged that Cobb County's district-wide policies prohibited the students' Individualized Education Plan teams from considering certain COVID-related accommodations—including masking—on a case-by-case basis. The students asked the district court to enjoin the School District "from imposing a blanket ban on Students' requested accommodations"—*i.e.*, to order the School District at least to *consider* masking and other health protocols on an individualized basis. Am. Prelim. Inj. Mot. at 1, Dkt. No. 74–1.

The district court denied the motion again. It dismissed for lack of standing A.Z. and C.S., who by then had switched to private schools, reasoning that they couldn't show that the School District's actions would affect them because they had unenrolled. As for B.B. and L.E., the district court ruled that they hadn't established a substantial likelihood on the merits of their failure-to-accommodate claims. As the district court saw things, the School District had already "conducted individualized inquiries and ha[d] provided Plaintiffs with reasonable accommodations"—including, for example, giving them "preferential seating," "disinfect[ing] classroom surfaces" before L.E.'s arrival, allowing both students "to transition to and from classes before other students," and giving L.E. "access to a designated, less-trafficked bathroom." Order on

Prelim. Inj. at 13–15, Dkt. No. 82.  These accommodations had "by-and-large been effective, allowing the students to attend in-person schooling as often as their health allows."  *Id.* at 15.  Accordingly, the district court held, a preliminary injunction was unwarranted.

This is the students' second appeal.

## II

At the outset, we address two jurisdictional issues: (a) whether the students have standing to sue and (b) whether the students' lawsuit is moot.[3]

## A

Article III standing "is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims."  *AT&T Mobility, LLC v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 494 F.3d 1356, 1359 (11th Cir. 2007) (citation and quotation marks omitted).  Under Supreme Court precedent, in order to have standing the plaintiff must establish "an injury in fact that is concrete, particularized, and actual or imminent," that "was likely caused by the defendant," and that "would likely be redressed by judicial relief."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021).  Standing is not a wholesale deal:  "[P]laintiffs must demonstrate standing for each claim that they press and for each form of

---

[3] Our standard of review is de novo for both jurisdictional questions.  *See Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1112 (11th Cir. 2021) (standing); *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1282 (11th Cir. 2004) (mootness).

relief that they seek." *Id.* at 431. While past harm may suffice for damages, standing for injunctive relief requires the plaintiff to prove a substantial likelihood of future injury. *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1283–84 (11th Cir. 2001); *Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Whatever the relief sought, "Article III standing must be determined as of the time at which the plaintiff's complaint is filed." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992) (citation omitted) ("The existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*.").

This case raises two standing-related questions: (1) whether A.Z. and C.S. lost standing to sue when they unenrolled from the District schools; and (2) whether all four students have standing to seek injunctive relief. We address each question in turn.

**1**

The district court dismissed A.Z. and C.S. for lack of standing. Because A.Z. and C.S. had unenrolled from District schools and transferred to private schools, the district court reasoned that they couldn't prove "'a sufficient likelihood that they will be affected by the allegedly unlawful conduct' of Defendants." Order at 8 n.3 (alteration adopted) (citation omitted). We disagree, for two reasons.

Most conspicuously, the district court's dismissal of A.Z. and C.S. ignored the students' still-live damages claims. Both the ADA and RA provide for damages to compensate disabled persons for

harms resulting from past disability discrimination. *See Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 160 (2017). Unlike injunctive relief, standing for damages requires only past harm—*not* future injury. *Sierra v. City of Hallandale Beach*, 996 F.3d 1110, 1113 (11th Cir. 2021). Unenrolling from District schools thus didn't extinguish A.Z.'s and C.S.'s damages claims for past discrimination that they say they suffered while still attending Cobb County schools.

Moreover, and in any event, the district court's analysis seems to have conflated two jurisdictional doctrines. The crucial moment for assessing *standing* is the outset of litigation—"the time at which a plaintiff's complaint is filed." *Focus on the Fam.*, 344 F.3d at 1275. Later events don't divest the plaintiff of standing—even for injunctive relief. *Id.* at 1275–76; *accord, e.g.*, *Keister v. Bell*, 29 F.4th 1239, 1256–57 (11th Cir. 2022) (concluding that the plaintiff had standing for injunctive relief even where the defendant replaced the challenged policy after the plaintiff filed his complaint). Post-filing events might well bear on *mootness*—but not standing. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 170 (2000) ("'The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" (citation omitted)); *West Virginia v. EPA*, 597 U.S. 697, 719 (2022) ("It is the doctrine of *mootness*, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of the lawsuit.'" (citation omitted)); *Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1267 (11th Cir. 2001) ("[A] party's standing to sue is generally measured at the time of the complaint, with the effect

of subsequent events generally analyzed under mootness principles.").

In light of these principles, the district court erred when it assessed A.Z.'s and C.S.'s standing differently from the still-enrolled students. The fact that A.Z. and C.S. had unenrolled from the District schools after filing suit was irrelevant to whether they had standing.[4] What matters for standing purposes is that A.Z. and C.S., like B.B. and L.E., were enrolled in District schools when they filed suit. A.Z.'s and C.S.'s standing—both for damages and injunctive relief—thus rises and falls with that of their peers.

**2**

"[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek . . . ." *TransUnion*, 594 U.S. at 431. "Because injunctions regulate future conduct, a party has standing to

---

[4] The School District cites various cases in support of its assertion that "when a student withdraws from a school district or university and has no present intent to return, the student no longer faces an imminent threat from his former institution's policies and thus forfeits standing to enjoin them." *See* Br. of Appellees at 24–27 (collecting cases). But all those cases are distinguishable. In four of them, the plaintiffs withdrew or graduated from the school *before* filing their complaint. *See Williams v. Bd. of Regents of Univ. Sys. of Georgia*, 477 F.3d 1282, 1302–03 (11th Cir. 2007); *Kocsis v. Fla. State Univ. Bd. of Trustees*, 788 F. App'x 680, 685 n.3 (11th Cir. 2019); *Fuller ex rel. Fuller v. Decatur Pub. Sch. Bd. of Educ. Sch. Dist. 61*, 251 F.3d 662, 665 (7th Cir. 2001); *Mumid v. Abraham Lincoln High Sch.*, 618 F.3d 789, 792–93 (8th Cir. 2010). And, tellingly, one case was not about standing but mootness. *See Harris v. Univ. of Mass. Lowell*, 43 F.4th 187, 192 (1st Cir. 2022).

seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Wooden*, 247 F.3d at 1284 (citation omitted).

The students' bid for injunctive relief rests on their allegation that "they have been and continue to be denied meaningful access . . . because of [the School District's] policy and practice precluding necessary and effective accommodations," including mandatory masking. Br. of Appellants at 25. The students asked the district court to prohibit the School District "from imposing a blanket ban on [their] requested accommodations"—in other words, to require the School District at least to consider masking and other COVID measures on an individualized basis. Prelim. Inj. Mot. at 1. Although the district court ruled against the students on the merits, it implicitly held that B.B. and L.E. had standing when it dismissed only A.Z. and C.S. *See* Order at 8.

As already explained, the district court erred in dismissing A.Z. and C.S. for lack of standing. We now hold that all four students had standing to seek injunctive relief because at the outset of the litigation they established a sufficient threat of a concrete future injury. Let us explain.

The students' core allegation is that by banning masking mandates outright, the School District has refused to consider their requested accommodations on an individualized basis. This failure to accommodate, they allege, amounts to disability discrimination in violation of Title II of the ADA and Section 504 of the RA. We

have repeatedly held that someone who has personally experienced disability discrimination has suffered a concrete injury. In *Sierra*, for example, we emphasized that the ADA and RA create "a concrete interest in equal treatment" for disabled individuals, concluding that the plaintiff thus had suffered a concrete injury when he "was personally and directly subjected to discriminatory treatment." 996 F.3d at 1114; *accord Houston v. Marod Supermarkets, Inc.*, 733 F.3d 1323, 1332 (11th Cir. 2013) (ruling that the ADA plaintiff suffered a concrete injury "when he encounter[ed] architectural barriers that discriminate[d] against him on the basis of his disability"); *cf. TransUnion*, 594 U.S. at 425–26 (recognizing "discriminatory treatment" as a harm that "Congress may 'elevate to the status of [a] legally cognizable injur[y]'" (citation omitted)).

What matters for injunctive-relief purposes is that the students' alleged injuries were ongoing when they sued. Even now, on appeal, the students assert that they "*continue* to be denied meaningful access" due to the School District's prohibition on mask mandates. Br. of Appellants at 25 (emphasis added); *see also* Prelim. Inj. Mot. at 17. This continuing denial of the students' accommodation requests amounted to a "threat of *future* injury" sufficient to bestow standing for injunctive relief. *Wooden*, 247 F.3d at 1284.

Resisting this conclusion, the School District insists that the students' "fears of catching COVID-19 are too speculative to confer constitutional standing to seek a preliminary injunction." Br. of Appellees at 30. The School District relies on *Clapper v. Amnesty*

*International USA*, 568 U.S. 398 (2013), in which the Supreme Court held that the plaintiffs' fears that the government might intercept some of their communications were too speculative to confer standing to seek injunctive relief. *See id*. at 410. Nor did the Court accept the plaintiffs' efforts to "manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Id*. at 416.

But the School District's *Clapper*-based argument misconstrues the students' alleged injury. The harm they assert isn't a "fear[] of catching COVID-19" but, rather, the School District's alleged disability discrimination—namely, its refusal to consider their accommodation requests on an individualized basis, which they claim the ADA and RA require. That alleged discrimination was ongoing when the students sued for injunctive relief—and continues to this day—so there was nothing speculative about the alleged injury at the time of filing.

The School District seeks support in *E.T. v. Paxton*, 41 F.4th 709 (5th Cir. 2022), in which several students had sued Texas's governor under the ADA challenging his executive order banning mask mandates in public schools. *Id*. at 713. The Fifth Circuit concluded that the plaintiffs there lacked standing to seek injunctive relief. The court's first reason echoed *Clapper*: The plaintiffs' increased risk of catching COVID without a mask mandate was too speculative. *Id*. at 715. But the panel also denied the plaintiffs' attempt to reframe their injury as a "deprivation of access to in-person schooling on an equal basis with their non-disabled peers" or a "denial of

14                    Opinion of the Court                    23-11741

case-by-case decisionmaking." *Id*. at 716.  After all, "[w]hat matters for Article III is whether plaintiffs 'suffered an invasion of a *legally protected interest.*'"  *Id*. at 717 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).  Against this backdrop, the Fifth Circuit emphasized that neither the ADA nor RA entitled the plaintiffs to their preferred accommodation—only "*reasonable access* to covered facilities." *Id*.  Nor, it said, could denial of individual decisionmaking suffice because the plaintiffs had never "requested an accommodation" and because eliminating one accommodation did not "prevent case-by-case decisionmaking." *Id*. at 718.

 *Paxton* is distinguishable.  As we've already emphasized, the core injury that the students here allege isn't their fear of catching COVID—it's "the denial of meaningful access to their in-person education and the accompanying consequences, resulting from [the School District's] refusal to consider their requested accommodations" on an individualized basis.  Reply Br. at 8.  Unlike those in *Paxton*, the students here have requested accommodations that the School District denied and continues to deny.  And we disagree that they lack standing on the ground that the ADA and RA doesn't entitle them to the individualized-consideration accommodation they seek.  That's a merits issue—one we address below.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) (stating that courts "must not confuse weakness on the merits with absence of Article III standing" (alteration adopted) (citation and quotation marks omitted)); *Polelle v. Fla. Sec'y of State*, 131 F.4th 1201, 1211 (11th Cir. 2025) (explaining that "a plaintiff alleges 'the invasion of a legally protected interest' when a 'plaintiff has a

right to relief if the court accepts the plaintiff's interpretation of the constitutional or statutory laws on which the complaint relies'" (citation omitted)).

At the time they sued, all four students were seeking injunctive relief to remedy what they asserted was ongoing, actionable disability discrimination. That was enough to give them standing.

**B**

Again, mootness—*not* standing—is the doctrine that deals with developments after a case has been filed. "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief, then the case is moot and must be dismissed." *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335–36 (11th Cir. 2001) (per curiam). But "as long as the parties have a concrete interest, however small, in the outcome of litigation, the case is not moot." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012) (quotation marks omitted) (quoting *Ellis v. Ry. Clerks*, 466 U.S. 435, 442 (1984)). The party asserting mootness "bears the burden to establish that a once-live case has become moot." *West Virginia*, 597 U.S. at 700.

We addressed mootness in our previous encounter with this case. On that appeal, the School District argued that the case was moot "because the CDC COVID-19 guidelines no longer recommend[ed] mandatory masking, and the Students argued for a mask mandate at the motions hearing." *L.E.*, 55 F.4th at 1300. We disagreed, emphasizing that the students were seeking not only a mask mandate but also for "'this Court to order the district to strictly

comply with each and every one of the CDC's recommenda-tions.'" *Id.* at 1301 (citation omitted).  Those recommendations included "guidance for schools on how to accommodate students with disabilities." *Id.*  Because the students alleged that the School District's blanket ban "ignored those recommendations and contin-ues to disregard CDC guidance," there was still "a live controversy." *Id.*[5]

Similar reasons counsel that the students' claims remain live today—obviously as to damages but also as to injunctive relief.  In simple terms, the students allege that the School District is violat-ing the ADA and RA, and they want the district court to order the School District to change course.  They contend that "they have been and continue to be denied meaningful access . . . because of [the School District's] policy and practice precluding necessary and effective accommodations" and that A.Z. and C.S. "[un]enrolled from [the School District] because of this policy and practice."  Br. of Appellants at 25.  A.Z. and C.S. assert that dropping the masking ban "would allow them to return to [the School District] and mean-ingfully participate in the public education to which they are enti-tled."  Reply Br. at 7; *see* Am. Prelim. Inj. Mot. at 12 ("A.Z. still lives within the District and would prefer to attend her local public school, but that option has been denied to her because of the

---

[5] On this go-around, the School District doesn't spill much ink over mootness. In fact, its argument boils down to the one-sentence assertion that "[b]ecause an injunction changing CCSD's masking policies would not meaningfully ben-efit C.S. or A.Z., their requests for injunctive relief are moot."  Br. of Appellee at 30.

District's [policy]."); *id.* ("C.S. enrolled in a private school 'because the district refused to accommodate for his safety at school.'" (citation omitted)).[6]

All four students continue to demand that the School District "modify its policy and accommodate Students by implementing existing CDC guidelines and maintaining consistency with those guidelines in the event of subsequent changes." Br. of Appellants at 9. The latest CDC guidelines—implemented May 17, 2024—state that "[s]chools must provide reasonable modifications or reasonable accommodations, when necessary, to ensure equal access to in-person learning for students with disabilities during increased infectious illness activity." Preventing Spread of Infections in K–12 Schools, https://perma.cc/4MJE-7XT3 (last visited Aug. 4, 2026). On the students' theory, the School District's continuing refusal to consider some accommodations (including masking) on an individual basis conflicts with those guidelines. *See L.E.*, 55 F.4th at

---

[6] This situation differs from *Harris v. University of Massachusetts Lowell*, 43 F.4th 187 (1st Cir. 2022), on which the School District relied to make its standing argument but which, as we've explained, was actually about mootness. *See supra* at 10 n.4. There, the First Circuit held that two students' claims for injunctive relief pertaining to their universities' vaccination policies were moot because one student had graduated and the other had transferred to a different university; in those circumstances, the "challenged measures no longer affect[ed] any plaintiff's primary conduct." *Harris*, 43 F.4th at 192 (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67 (1997)) (citation modified). Here, the record doesn't show that A.Z. or C.S. left the School District, and both wish to reenroll at their local public schools but are prevented by the continued implementation of the School District's COVID policy.

1301.  More broadly, there is an ongoing dispute over whether the ADA and RA require the School District to consider the students' request for masking.  The students contend that the School District's masking ban amounts to ongoing disability discrimination, and the School District disagrees.  We therefore conclude that the dispute is not moot.

## III

Having dispensed with jurisdictional matters, we turn to the merits:  Was the district court right to deny B.B. and L.E.'s request for a preliminary injunction on the ground that their ADA and RA claims were unlikely to succeed?[7]

Title II of the ADA and Section 504 of the RA guarantee disabled individuals the opportunity to participate in, and access the benefits of, public services, programs, and activities.  42 U.S.C. § 12132; 29 U.S.C. § 794(a).[8]  A public entity's "failure to reasonably accommodate" a person's disability constitutes discrimination under the ADA and RA.  *Holly v. Clairson Indus., LLC*, 492 F.3d 1247, 1262 (11th Cir. 2007).  "To prevail on a failure-to-accommodate claim, a plaintiff must prove (1) that he is disabled, (2) that he requested a 'reasonable accommodation[],' (3) that the requested

---

[7] We review for abuse of discretion a district court's order denying a preliminary injunction.  *Scott v. Roberts*, 612 F.3d 1279, 1289 (11th Cir. 2010).  "In so doing, we review the findings of fact of the district court for clear error and legal conclusions *de novo*."  *Id*.

[8] ADA Title II and RA Section 504 claims share the same legal standard.  *L.E.*, 55 F.4th at 1301 n.2.

accommodation was 'necessary to afford [him an] equal opportunity to use and enjoy [the public facility or program],' and (4) that the defendant refused to make the requested accommodation." *Schaw v. Habitat for Human. of Citrus Cnty., Inc.*, 938 F.3d 1259, 1264 (11th Cir. 2019) (citation omitted).[9] Step two of *Schaw*'s test embodies its own burden-shifting framework:  If the plaintiff shows that his "request is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an 'undue burden' or result in a 'fundamental alteration' of its program." *Id.* at 1266 (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008)).

We divide our discussion into two parts.  First, we address the students' argument that the School District violated the ADA and RA by failing to conduct an individualized inquiry into their request for masking.  Second, we consider whether the district court was right to deny the preliminary injunction based on its

---

[9] *Schaw* involved the Fair Housing Act, but the Court "'look[ed] to case law' under the ADA and RA for 'guidance on what is reasonable under the [Fair Housing Amendments Act].'"  983 F.3d at 1265 n.2 (quoting *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1220 (11th Cir. 2008)).  *Schaw* also drew on (and maps on to) the Supreme Court's decision in *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001), which laid out the elements of a failure-to-accommodate claim under Title III of the ADA.  *See Schaw*, 983 F.3d at 1266; *see also PGA Tour*, 532 U.S. at 683 n.38 ("[T]he statute contemplates three inquiries: whether the requested modification is 'reasonable,' whether it is 'necessary' for the disabled individual, and whether it would 'fundamentally alter the nature of' the competition." (quoting 42 U.S.C. § 12182(b)(2)(A)(ii))).

conclusion that the School District's existing accommodations had proven effective.

## A

In their briefing, the students argued that the School District's "categorical ban" on masking violated its obligation under the ADA and RA "to conduct an individualized inquiry into Students' facially reasonable accommodation requests." Br. of Appellants at 28–29. In other words, the students maintained that the School District's masking ban was unlawful per se—without regard to whether they could satisfy *Schaw*'s four prongs. Then, at oral argument, the students appeared to retreat from that position. *See* Oral Arg. at 6:47–7:29, https://www.ca11.uscourts.gov/oral-argument-recordings.

Rightly so. Our caselaw doesn't support the proposition that a plaintiff can prevail on a failure-to-accommodate claim merely by showing that the defendant didn't conduct an individualized inquiry into the accommodation request. While the lack of an individualized inquiry is relevant to *Schaw*'s second prong, it isn't a fast pass to winning a failure-to-accommodate suit. Let us elaborate.

Much of the students' initial argument hinged on language taken from *PGA Tour, Inc. v. Martin*, 532 U.S. 661 (2001). In that ADA Title III case, a disabled professional golfer asked to use a golf cart in a competition, but the PGA refused to waive its rule that players must walk. *Id.* at 669. The PGA "d[id] not contest that a golf cart [wa]s a reasonable modification that [wa]s necessary if Martin [wa]s to play in its tournaments." *Id.* at 682. Instead, "the

narrow dispute [wa]s whether allowing Martin to use a golf cart . . . would 'fundamentally alter the nature'" of the competition. *Id.* The Court concluded that it wouldn't, rejecting the PGA's argument that "[t]he waiver of any possibly 'outcome-affecting' rule for a contestant would . . . fundamentally alter the nature of the highest level athletic event." *Id.* at 686. Even if that argument had been factually accurate, the Court said, the "legal position" underlying it would still have been "fatally flawed." *Id.* at 688. The Court concluded that the PGA's "refusal to consider Martin's personal circumstances in deciding whether to accommodate his disability r[an] counter to the clear language and purpose of the ADA." *Id.* Instead, the Court held, "[t]o comply with [the ADA's] command, an individualized inquiry must be made to determine whether a specific modification for a particular person's disability would be reasonable under the circumstances as well as necessary for that person, and yet at the same time not work a fundamental alteration." *Id.*

In *Martin*'s wake, we have once already rejected an ADA claim premised on the failure to conduct an individualized inquiry. In *A.L. v. Walt Disney Parks & Resorts US, Inc.*, 900 F.3d 1270 (11th Cir. 2018) (*Disney I*), the plaintiffs challenged Disney's Disability Access Service program for theme parks as "an impermissible 'blanket' or 'one size fits all' policy for all disabled persons with autism and/or cognitive impairments"—which, they asserted, violated the ADA "because Disney [wa]s not making the required individualized assessment." *Id.* at 1290. We disagreed, noting that the case was "unique in two ways": First, we highlighted that Disney's

program satisfied the needs of even the most severely autistic children and was thus necessarily sufficient for the less disabled; and second, we emphasized that it would be impracticable to require Disney to individually assess each of its millions of visitors' needs. *Id*. at 1291. In that context, we "conclude[d] that Disney's generalized issuance of [access cards], in and of itself, d[id] not violate the ADA." *Id*. After all, this was "not a case where a plaintiff guest ha[d] been *denied* accommodations across the board." *Id*. In other words, "[i]f an accommodation *actually* provides all necessary modifications for a severe disability across the board, it does not violate the ADA." *Id*.

The key question here is whether the School District must individually consider the students' requested accommodation (*i.e.*, mandatory masking) lest it automatically violate the ADA. In other words, we must address whether a blanket rule is *ipso facto* unlawful—even if the plaintiff doesn't meet *Schaw*'s four prongs. On our read of the caselaw, the answer is no.

*Martin*'s holding is narrower than the students initially contended. In that case, the parties agreed that the golf cart was both facially reasonable *and necessary*. 532 U.S. at 682. In other words, it was undisputed that the plaintiff golfer couldn't compete at all without the accommodation. The controversy was solely about whether the cart would "fundamentally alter the nature" of the competition. *Id*. It's in this context that the Supreme Court faulted the PGA for refusing outright "to consider Martin's personal

circumstances in deciding whether to accommodate his disability." *Id.* at 688.

*Martin*'s context indicates that the individualized-inquiry requirement is confined to the element of reasonableness—*i.e.*, what *Schaw* describes as step two. To recap, that prong has its own burden-shifting framework: If the plaintiff shows that his "request is facially reasonable, the burden shifts to the defendant, who must prove that the accommodation would nonetheless impose an 'undue burden' or result in a 'fundamental alteration' of its program." *Schaw*, 983 F.3d at 1266 (quoting *Schwarz*, 544 F.3d at 1220); *see also Martin*, 532 U.S. at 683 n.38. *Martin* simply held that a defendant can't win at that stage merely by baldly asserting, without any individualized inquiry, that the plaintiff's accommodation would "fundamentally alter the nature of" its program. *See Martin*, 532 U.S. at 686. In *Disney I*, we reinforced the narrow role that the individualized-inquiry requirement plays when we held that a blanket policy that "actually provides all necessary modifications for a severe disability across the board . . . does not violate the ADA." 900 F.3d at 1291.

Here's the upshot: A plaintiff who challenges a blanket ban on certain accommodations (like masking) can satisfy *Schaw*'s second prong by showing that the defendant failed to conduct an individualized inquiry. But that does *not* mean that the plaintiff automatically prevails on her entire failure-to-accommodate claim. Title II's other requirements—including necessity—don't evaporate in the case of a blanket ban; a plaintiff must satisfy those

elements all the same.  The district court here ruled that the School District had indeed "conducted individualized inquiries" and given each student tailored accommodations.  *See* Order at 13.  That conclusion seems to have misconstrued the students' claim.  To be sure, the School District did provide the students with personalized accommodations, but it refused outright—without any individualized consideration—to grant the students' requests for mandatory masking due to the masking ban.  That was enough for the students to satisfy the reasonableness element (*Schaw*'s second prong)—but *not enough* to win on all four.  To show a likelihood of success on the merits, and to obtain a preliminary injunction, the students needed also, among other things, to establish that mandatory masking was *necessary*.[10]

**B**

At prong three, *Schaw* requires a plaintiff to prove "that the requested accommodation was 'necessary to afford [him an] equal opportunity to use and enjoy'" the public facility or program.  938 F.3d at 1264 (citation omitted).  To succeed on this element, a plaintiff must show two things: (1) that the accommodation would "alleviate[] the effects of [his] disability," *id.* at 1269 (quoting *Bhogaita v. Altamonte Heights Condo. Ass'n, Inc.*, 765 F.3d 1277, 1288 (11th Cir. 2014)); and (2) that the accommodation is necessary to "ensur[e] that disabled individuals receive the same opportunities as other individuals," *id.* at 1272.  In other words, while there might be

---

[10] Because we decide the case based on necessity, we needn't address *Schaw*'s other two prongs.

multiple accommodations that would "alleviate[] the effects of [a plaintiff's] disability," the ADA and RA require only those accommodations without which "disabled individuals [would not] receive the same opportunities as other individuals." *See id.* at 1269, 1272. For example, it might be necessary to allow a disabled sprinter to use prosthetic legs, but not to race the other athletes on a horse or in a Ferrari.

After recognizing that the students' requested mask mandate was "not facially unreasonable," Order at 12, the district court concluded that B.B. and L.E. were nonetheless unlikely to prevail on the merits because the School District "ha[d] provided [them] with reasonable accommodations to allow them meaningful access to an in-person education," *id.* at 15. Those accommodations included giving both students "preferential seating" and allowing them "to transition to and from classes before other students," as well as "disinfect[ing] classroom surfaces" before L.E.'s arrival and giving him "access to a designated, less-trafficked bathroom." *Id.* at 13. As the district court saw things, "those measures ha[d] by-and-large been effective, allowing the students to attend in-person schooling as often as their health allows." *Id.* at 15. The district court emphasized that "B.B. ha[d] attended in-person for more than 70% of possible school days and [wa]s receiving all A's," and that L.E. "attended some in-person schooling between August and December 2022 before accumulating absences because of non-COVID illnesses" and was "passing all of his classes [and] progressing in all of his IEP goals." *Id.* at 14.

Although the district court didn't expressly invoke *Schaw*'s necessity prong, we affirm its decision on the substance. We hold that the district court did not clearly err in finding that the School District's accommodations had been largely effective and that B.B. and L.E. thus were unlikely to win on the merits.

Our follow-up decision in *Disney* supports our conclusion. In *A.L. v. Walt Disney Parks & Resorts U.S., Inc.*, 50 F.4th 1097 (11th Cir. 2022) (*Disney II*), we affirmed the district court's decision that the plaintiff's "requested modification to receive either ten 'Re-admission Passes' for each person in his party or unlimited access to Disney's expedited 'FastPass' lines for its theme park attractions was neither necessary . . . nor reasonable." *Id.* at 1101. Regarding necessity, we emphasized "that Disney must afford A.L. 'the opportunity to have something akin to or similar to the experience' of non-disabled guests but [] 'was not required to make the preferred accommodation of A.L.'s choice.'" *Id.* at 1108 (citation omitted). The district court's finding on necessity was "not clearly erroneous" because the record supported the conclusion that Disney's existing accommodations "provided a like experience." *Id.* at 1109.

So too here. The district court considered the tailored accommodations that the School District had already provided B.B. and L.E. and found that "those measures ha[d] by-and-large been effective, allowing the students to attend in-person schooling as often as their health allows." Order at 15. The district court made specific observations about the two students' attendance, grades, and progression toward their Individualized Education Plan goals.

*See id.* at 14.  To be sure, B.B. and L.E. missed some in-person instruction, but the record indicates that many of those absences were due to non-COVID-related illness.  Having considered the relevant evidence, the district court saw no need for the School District to grant the two students' request for a mask mandate.  That decision was not clearly erroneous, and we thus uphold it.

## IV

The district court erred in dismissing A.Z. and C.S. from the case for lack of standing but correctly concluded that B.B. and L.E. were unlikely to win on the merits.  We thus **REVERSE** the district court's ruling that A.Z. and C.S. did not have standing and **REMAND** for the district court to address the merits of their claims.  As for B.B. and L.E., we **AFFIRM** the district court's denial of the preliminary injunction.